UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RICHARD ROCKY IVERSON,<br><br>Defendant. | Case No. 4:22-cr-00034-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Defendant Richard Rocky Iverson's Motion to Suppress. Dkt. 20. On July 25, 2022, the Court held an evidentiary hearing and took the motion under advisement. For the reasons outlined below, the Court finds good cause to GRANT the motion.

## II. BACKGROUND

### A. Factual Background[1]

Defendant Richard Rocky Iverson is charged with one count of possession of a firearm by a prohibited person and two counts of possession of ammunition by a prohibited person. Dkt. 1. Law enforcement discovered evidence to support these charges during a search of the house at 330 W 300 N Blackfoot, Idaho (the "Blackfoot Residence"), on February 14, 2021.

---

[1] Unless otherwise indicated, these facts come from the testimony at the evidentiary hearing on July 25, 2022.

A few days earlier, on February 10, 2021, law enforcement obtained a search warrant for Richard Rocky Iverson, who was being investigated for lewd and lascivious conduct with a minor. Dkt. 20-2. The warrant authorized Iverson's arrest and the search of the Blackfoot Residence for cellphones, computers, recording devices, and children's clothing. The Blackfoot Residence was Iverson's known residence though it had been owned by his mother until her recent death. The officers executed the warrant at the house, but they did not find Iverson. After the officers executed the February 10 search warrant, Iverson's sister locked the house to prevent thefts. Iverson's sister did not know whether Iverson had a key to the house.

After that search, officers sought to discover Iverson's whereabouts. On February 13, 2021, law enforcement received information that Iverson was at a residence belonging to Brandon Stecklein in Pocatello, Idaho. Officers set up surveillance around the residence. One of the officers was Detective Jonathan Hay, who was wearing civilian clothes and was in an unmarked vehicle. Detective Hay observed two male individuals, whom he believed were Stecklein and Iverson,[2] get out of a truck and head toward Detective Hay's vehicle. Stecklein came up to the driver's window and began yelling at Detective Hay, demanding to know what Detective Hay was doing there. While Stecklein was yelling, Detective Hay observed Stecklein reach to his waistline as if to draw a firearm. In response, Detective Hay began to act like he was drunk and lost. Stecklein let Detective Hay leave without further incident.

---

[2] Detective Hay was later able to confirm that the two men were indeed Stecklein and Iverson.

MEMORANDUM DECISION AND ORDER - 2

Not long after, other officers engaged with Stecklein and Iverson. Iverson fled the scene. Stecklein then got into a shootout with the officers and died.

On February 14, 2021, Detective Hay and other officers returned to the Blackfoot Residence to try to locate Iverson. Outside the Blackfoot Residence was a car that had not been there during the earlier search on February 10. Fresh tire tracks marked the snow, indicating to officers that the car had recently arrived. Detective Hay noticed that the driver's seat was pushed forward, approximately 24 to 36 inches from the steering wheel, and a six-pack of beer on the floorboard was missing two bottles. Detective Hay also observed footprints in the snow, going from the driver's door to the front door of the house and to a house window where a pool ladder was placed. He saw no footprints leading from any passenger door, and he did not observe whether the footprints appeared to be left by the same person or different people. Detective Hay examined the window where the pool ladder was placed and noticed that it was broken, indicating that it had been forced open.

Through that window, Detective Hay was able to make verbal contact with Iverson, who was inside the house. Detective Hay then was able to convince Iverson to talk with him via phone. The phone conversation was peaceful and lasted approximately forty-five minutes. During the phone conversation, Iverson told Detective Hay that no one else was in the house, and Detective Hay did not hear any other voices. At the end of the conversation, Iverson placed his phone on the windowsill and exited out of the window. He peacefully surrendered himself to the officers, who placed him under arrest and in a patrol vehicle. At the time of the arrest, approximately sixteen officers were on the scene.

Instead of driving away with Iverson, the officers decided to conduct a protective

sweep of the house. After approximately five to ten minutes of planning, an officer put a K9 through the open window to search for people. The K9 searched only the room Iverson had been in, and the K9 did not alert. Eight to twelve officers then entered the house for the protective sweep, and the sweep lasted five to eight minutes.

Officers did not find anyone inside the house, but they did find a gun holster, a shotgun shell, a small baggy of a substance that appeared to be marijuana, and a white substance that appeared to be methamphetamine. Dkt. 20-4, at 3. Based on this discovery, officers applied for a search warrant for evidence of firearms and controlled substances. *Id.* at 2. During the execution of that search warrant, law enforcement found and seized the evidence for this case, namely a Taurus PT 111 Pro Millennium 9mm pistol and ammunition.

Iverson argues this evidence should be suppressed because the protective sweep was unlawful and led to the eventual discovery of the pistol and ammunition.

### B. State Court Suppression Hearing and Federal Court Suppression Hearing

Following the search, the State of Idaho charged Iverson with drug possession crimes in Bingham County, case number CR06-21-1001. In that case, Iverson moved to suppress the evidence found during the February 14 search of the Blackfoot Residence. The state court held a hearing (the "state court hearing"), at which Detective Hay testified, and the state court granted the motion to suppress.

In the instant case, Iverson provided the Court with a copy of the transcript from the state court hearing. Dkt. 20-5. After the Court held its own suppression hearing (the "federal court hearing") on July 25, 2022, the Government filed a "Supplemental Closing

Argument" to which the Government attached the state court's suppression decision. Dkts. 32; 32-1. Iverson replied to the Supplement Closing Argument on August 5, 2022. Dkt. 33.

Part of the Government's argument in the instant case is that it would be appropriate for this Court to rule differently on the motion to suppress than the state court did because the state prosecutor was ill-prepared for the state court hearing and thus failed to present all the evidence needed to secure the desired outcome. This Court has compared the transcripts of the state court and federal court hearings and has read the state court's decision to suppress the evidence. The evidence presented during the state suppression hearing is substantially similar to the evidence presented during the federal suppression hearing. Detective Hay was the prosecution's only witness in the respective hearings. Some things were covered in more depth in the state court hearing, and some were covered in more depth in the federal court hearing. No part of the record reveals a lack of preparation on the part of the state prosecutor.

The Government argues in its Supplemental Closing Argument that the following facts were omitted from the state court's findings and were established at the federal court hearing: (1) that officers confirmed Iverson was with Stecklein, (2) that the window was broken, (3) that Detective Hay was "certain"[3] Iverson had either a victim or an accomplice within the house, and (4) that Detective Hay had received information that Iverson had a gun.

---

[3] The Government argues that Detective Hay was "certain" Iverson had someone with him. Dkt. 32, at 3. However, as will be discussed later, Detective Hay was not certain.

MEMORANDUM DECISION AND ORDER - 5

*1. Iverson and Stecklein*

The state court found that "Detective Hay had information that Iverson was with Stecklein" and that "Detective Hay saw someone of a similar size and with similar features as Iverson" during his confrontation with Stecklein prior to the shooting. Dkt. 32-1, at 3. The state court noted in its findings that the man with Stecklein "was not positively identified as Iverson." *Id.* At the state court hearing, Iverson argued that the state did not have any evidence that Iverson was there with Stecklein. Dkt. 20-5, at 18. However, the state court judge allowed testimony about the Stecklein incident, over Iverson's objection, because it went to Detective Hay's state of mind during the search. *Id.*

At the federal court hearing, Iverson did not dispute that he was with Stecklein, and Detective Hay provided additional information to confirm his identification of Iverson. Therefore, this Court finds that Iverson was indeed with Stecklein immediately prior to the shooting.

*2. The Broken Window*

While there was significant testimony during the state court hearing about the window being used as an entry to the house, there was no testimony that the window was "broken." *See id.* at 86. Instead, the testimony was that the window was "open." *Id.* at 88.

At the federal court hearing, Detective Hay testified the glass was intact, but the window was broken such that when an officer touched it, the whole window pushed inside the residence. Detective Hay also testified that this was concerning because it indicated that someone was in the house and had entered through the window rather than the front door. The Court accepts Detective Hay's testimony and finds that the window was broken.

However, as will be later discussed, the distinction between open and broken is of minimal significance.

    3.  *Detective Hay's Certainty About a Victim or an Accomplice*

At the state court hearing, Detective Hay testified that the officers conducted the protective sweep because he *believed* someone else was in the house. *Id.* at 67.

At the federal court hearing, the Government asked Detective Hay if he was "fairly certain" that somebody was inside the house with Iverson. Detective Hay responded that he "believed so."[4] Detective Hay also testified that Iverson may have carjacked or kidnapped someone and left the victim tied up inside the house. On cross examination, Iverson's defense counsel asked whether Detective Hay had any reports of carjacking or kidnapping, and Detective Hay replied no. Defense counsel then asked if it was only speculation that someone else could be in the house, and Detective Hay replied yes.

The Government characterizes Detective Hay's testimony as "certain" about a victim or an accomplice being present; but the testimony was hardly certain. First, Detective Hay did not know whether the purported other person was a victim *or* an accomplice. Second, Detective Hay did not identify *who* he or the other officers believed was in the house with Iverson. Finally, and most significantly, Detective Hay agreed that this was speculation. Thus, the Court cannot find that Detective Hay was *certain* anyone else was in the house with Iverson.

Of note, there was no mention of a possible victim during the state court hearing.

---

[4] Neither party has ordered the official transcript in this case. The Court has reviewed the unofficial transcript and has confirmed the accuracy of the quoted language.

MEMORANDUM DECISION AND ORDER - 7

During closing arguments at the federal court hearing, the Government tried faulting the state prosecutor for not asking Detective Hay about whether the officers had reason to believe a victim was in the house. But the state prosecutor did ask Detective Hay what the reasons were for the protective sweep, and that would have been opportunity enough for Detective Hay to mention the possibility of a victim. There is also no mention of a possible victim in the Government's Response to the instant Motion to Suppress. *See* Dkt. 25. Detective Hay's testimony about the possibility of a victim lacks evidentiary support, and there was no mention of this justification at all until the federal court hearing.

4. *The Gun*

At the state court hearing, there was no testimony about Iverson having a gun. But at the federal court hearing, Detective Hay testified that law enforcement received information from Veronica Brakke, a close contact of Iverson's, that Iverson had a 9mm pistol and that was a factor in deciding to conduct a protective sweep. The Court finds this testimony credible; however, the effect is minimal as will be explained later.

### III. LEGAL STANDARD

While "[t]he Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands," *United States v. Leon*, 468 U.S. 897, 906 (1984), the exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect," *United States v. Calandra*, 414 U.S. 338, 348 (1974). Under the exclusionary rule, "illegally seized evidence" cannot be used "against the search victim in a criminal trial." *Id.* at 350.

When a defendant challenges a warrantless search or seizure, the government bears the burden of establishing by a preponderance of evidence that the search or seizure did not violate the Fourth Amendment. *United States v. Carbajal*, 956 F.2d 924, 930 (9th Cir. 1992); *United States v. Johnson*, 936 F.2d 1082, 1084 (9th Cir. 1991); *see also United States v. Jeffers*, 342 U.S. 48, 51 (1951).

A warrantless search of a house presumptively violates the Fourth Amendment. *Payton v. New York*, 445 U.S. 573, 586 (1980). "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed . . . ." *United States v. United States District Court*, 407 U.S. 297, 313 (1972).

There are, however, exceptions that allow searches of a house without a warrant. Searching the house as part of a "protective sweep" is one such exception. *Maryland v. Buie*, 494 U.S. 325, 334 (1990). "[A] protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found." *Id.* at 335. Additionally, a protective sweep cannot last "longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–36. And a protective sweep is justified only if it is limited to "closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched" *or* if there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 334.

MEMORANDUM DECISION AND ORDER - 9

# IV. ANALYSIS

Iverson argues that the protective sweep in this case was unreasonable because it lasted longer than necessary to complete the arrest and because law enforcement lacked articulable facts that would lead a reasonably prudent officer to believe that there was anyone else in the house who posed a danger to those at the scene.

The Government argues that the protective sweep was justified because officers knew that Iverson did not have his own vehicle, Iverson almost always rode with someone, the driver's seat was pushed forward indicating a smaller person than Iverson was driving, there was a six-pack of beer in the car with two cans missing, the window was broken, Iverson had a 9mm gun, and Iverson was with Stecklein immediately prior to Stecklein's shootout with law enforcement on the night before.

At the hearing, the Government raised an alternative theory for why the warrantless search was reasonable—there may have been a victim, rather than a dangerous person, inside the house. This theory does not fall under the "protective sweep" exception but rather the "emergency aid" exception. *Mahrt v. Beard*, 849 F.3d 1164, 1171–72 (9th Cir. 2017).

For the reasons below, the Court holds that the warrantless search was not justified by either the protective sweep exception or the emergency aid exception.

## A. Protective Sweep Exception

To justify the warrantless search under the protective sweep exception, the Government must show that law enforcement had reasonable belief based on articulable and specific facts that (1) someone other than Iverson was in the house *and* (2) the other

MEMORANDUM DECISION AND ORDER - 10

person was dangerous.⁵

1. *Whether Someone Else Was in the House*

The Government relies on the following facts to support the officers' belief that someone other than Iverson was inside the house: (1) Iverson did not have his own vehicle and almost always got rides from other people; (2) the driver's seat was pushed forward, suggesting that Iverson, who is 5 foot 11 inches, may not have been the driver; and (3) two bottles were missing from the six-pack of beer. The Government argues that these facts led Detective Hay to believe someone else was in the house.

In a vacuum, those facts may be enough to support a reasonable belief that someone was in the house. However, there are several facts that cut against that conclusion. First, Iverson told Detective Hay that no one was inside. *See United States v. Reid*, 226 F.3d 1020, 1028 (9th Cir. 2000) (holding search was not justified under the protective sweep in part because the suspect told officers that no one else was inside the apartment); *United States v. Franco*, 744 F. App'x 360, 363 (9th Cir. 2018) (officers entered locked room after family told them no one was in that room). While Detective Hay may have doubted Iverson's credibility, Detective Hay did not testify that he pressed Iverson on the issue or talked to him about the people who officers may have suspected were inside. Second, Detective Hay spoke with Iverson peacefully for forty-five minutes before Iverson's arrest. During that time, Detective Hay and the other officers did not hear any noises that could

---

⁵ The Government does not argue, nor could it, that this was a protective sweep of the "spaces immediately adjoining the place of arrest." *Buie*, 494 U.S. at 334. Therefore, the Government must have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.*

MEMORANDUM DECISION AND ORDER - 11

have come from another person, nor did they observe any threat from another person. *See United States v. Senegal*, 2019 WL 7989941, at *7 (D. Nev. Dec. 20, 2019) (holding the search "was not justified as a protective sweep" and noting that officers did not hear any "further noise coming from the apartment" or observe anything "contemporaneously occurring that would justify a belief that there was a suspicion of danger"). Third, the officers put a K9 into the house to look for people, and it did not alert that anyone was there. Though the K9 was restrained to only the room in which Iverson had just left, this still undercut belief that someone was in at least that part of the house. Fourth, Detective Hay observed footprints leading from the driver's door only; he did not see any footprints leading from any passenger door. Finally, Detective Hay testified that his belief that someone was inside the house was based on speculation. *See Senegal*, 2019 WL 7989941, at *7 ("[A]n officer's lack of information about who is or is not in the home does not, on its own, justify a protective sweep."). All these facts taken together suggest that the officers' belief about another person or persons being inside was not reasonable and was instead speculative.

Additionally, there are some weaknesses in the facts Detective Hay relied on. A single person can drink more than one bottle of beer, and there is no evidence that officers knew that the two bottles had been recently removed together rather than removed separately or long before. The fact that two bottles were missing can hardly suggest that there were two or more people in the car. *Cf. Reid*, 226 F.3d at 1028 ("The smell of burning marijuana cannot satisfy the heavy burden that the government must overcome because one person can smoke marijuana alone.").

There was also no evidence that Iverson could not have driven with the seat in that position. Detective Hay testified that the seat was 24 to 36 inches from the steering wheel. Iverson's height is not so exceptional to make a seat distance in that range particularly unusual. Detective Hay observed that the seat was pushed forward and that it seemed too small of a distance for someone the size of Iverson to comfortably drive the car, and Detective Hay's observation and inference may have been appropriate. However, considering the other available facts, the seat position is not enough to suggest that someone was in the house.

The strongest indicator was officers' knowledge that Iverson did not have his own vehicle and almost always got rides from others. Even so, Detective Hay testified that he knew Iverson had borrowed a car and driven it himself at least on one other occasion, and Detective Hay did not identify any people Iverson could have been riding with that day.

Looking at all the information available to officers at the time, officers did not have sufficient reason to believe that someone was inside with Iverson. And even if the officers did reasonably believe that someone was inside, they did not reasonably believe the other person posed a danger.

2. *Whether the Other Person Was Dangerous*

The "justification for a protective sweep cannot be based on the dangerousness of the arrested individual; it must be based on an articulable suspicion of danger from *other* persons present in the home." *United States v. Henderson*, 2022 WL 843338, at *4 (D. Or. Mar. 22, 2022) (citing *United States v. Colbert*, 76 F.3d 773, 777 (6th Cir. 1996) ("The facts upon which officers may justify a *Buie* protective sweep are those facts giving rise to

MEMORANDUM DECISION AND ORDER - 13

a suspicion of danger from attack by a third party during the arrest, not the dangerousness of the arrested individual.")); *see also United States v. Lundin*, 817 F.3d 1151, 1161 (9th Cir. 2016) (holding that protective sweep exception did not apply when "the only plausible threat to the safety of those on the scene" was the arrested suspect who "had already been handcuffed and placed in a police vehicle").

The Government relies on three specific facts known to officers at the time of Iverson's arrest to support the protective sweep: (1) the window was broken, (2) officers received a report that Iverson had a 9mm pistol, and (3) Iverson was with Stecklein immediately prior to the shootout between Stecklein and law enforcement.

The window being broken does not suggest that anyone other than Iverson was present and dangerous. Iverson and law enforcement used the broken window as entry into the house. Nothing about the broken window indicates that anyone other than Iverson was inside the house and was dangerous.

Iverson's possession of a 9mm pistol also does not indicate that someone else in the house was dangerous. This fact goes only to Iverson's dangerousness, and his dangerousness is not "germane to the inquiry into whether the police may conduct a protective sweep in response to a reasonable suspicion of a threat from some *other person* inside the home." *Colbert*, 76 F.3d at 777. "The presence of a firearm alone is not an exigent circumstance." *United States v. Gooch*, 6 F.3d 673, 680 (9th Cir. 1993). In *Henderson*, the Government argued that a protective sweep was justified because "the officers did not know the location of the gun used in the robbery, and they suspected it was inside the home." *Henderson*, 2022 WL 843338, at *4 n.3. However, before the officers

entered the home, they had handcuffed the suspect outside. *Id.* Therefore, the court held that "the location of the gun is only relevant if officers could articulate a suspicion that someone else was inside the home who might use the gun." *Id.* The same is true here, and the Government failed to show that officers had articulable reasons to believe someone else might use the pistol.

Understandably, officers went to the Blackfoot Residence on February 14 with some apprehension because of the shootout the night before. However, that apprehension does not itself justify a protective sweep. Stecklein was dead, and the officers knew that when they went to the Blackfoot Residence on February 14. Officers also knew that Iverson had fled the scene in Pocatello *before* the shootout. Officers did not know whether Iverson had found another dangerous person that night and taken him or her to the Blackfoot Residence. At the hearing, Detective Hay speculated that Iverson may have carjacked someone, kidnapped someone, or was in the company of someone dangerous between the shootout on February 13 and the search on February 14. But Detective Hay admitted he had received no information to support those suspicions. His suspicions were based on speculation.

This is not a case where law enforcement had someone specific in mind, such as a known accomplice, whom they were looking for and who they believed was dangerous. *Cf. United States v. Paopao*, 469 F.3d 760, 763 (officers received credible tip that two men suspected of robbery were inside apartment, one of the men exited when officers arrived, and then the officers conducted a justified protective sweep looking for the other suspect). Nor is this a case where officers knew because of the nature of the crime being investigated that there were most likely other dangerous individuals present on the scene. *Cf. United*

MEMORANDUM DECISION AND ORDER - 15

*States v. Castillo*, 866 F.2d 1071, 1081 (9th Cir. 1988) (officers arrested the head of a narcotics trafficking conspiracy in the doorway of his apartment, and then conducted a justified protective sweep on the reasonable belief that conspiracy members stayed at the apartment to help guard the narcotics supply and money). Here, there is only the generalized suspicion that Iverson may be around someone dangerous because the night before the search Iverson was with Stecklein, who was indeed dangerous. But generalized suspicion that "suspects fleeing police sometimes run to join dangerous accomplices" is "not sufficient to support" a protective sweep. *United States v. Garcia*, 749 F. App'x 516, 520 (9th Cir. 2018).

Because the Government has not shown adequate evidence to demonstrate the officers had a reasonable belief that someone dangerous was in the house, the warrantless search was not justified under the protective sweep exception. Protective sweeps serve the purpose of protecting officers from unexpected attacks while they are arresting a suspect. *Buie*, 494 U.S. at 333. Iverson was safely handcuffed and placed inside the patrol car for at least five minutes before the officers entered the house. After arresting Iverson, the officers could have driven away. Instead, they stayed on the scene and conducted a warrantless search. The Court cannot find that this search was in the interest of officer safety.

B. **Emergency Aid Exception**

As mentioned earlier, the Government presented a new theory at the suppression hearing to justify the warrantless search. Detective Hay testified that one of the reasons for

MEMORANDUM DECISION AND ORDER - 16

the search was to look for any victim of kidnapping that may be tied up somewhere in the house. This theory was not presented during the state court hearing or in the Government's brief opposing the instant Motion. Detective Hay testified that he had not received any reports or information to support his belief that there may be a victim inside the house and that this belief was based on speculation.

Under the emergency aid exception, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (cleaned up). "To invoke this 'emergency aid' exception, an officer must have an objectively reasonable basis for believing both that a person is inside the house and that the person is in need of immediate aid." *Mahrt*, 849 F.3d at 1172.

The Court harbors some skepticism about the late emergence of this new theory. The state court hearing focused only on whether someone posed a danger to law enforcement, and the briefing in the instant case led this Court to expect testimony on only that issue as well. At the federal court hearing, the Court heard for the first time this theory about a possible victim.

There is no evidentiary support for this theory. Detective Hay testified that he only speculated that there may have been a kidnapped victim tied up in the house. There was no testimony that Detective Hay had a specific victim in mind. Detective Hay had no reports of such a crime. Detective Hay spoke with Iverson for forty-five minutes, and there is no evidence that they discussed a possible victim being inside the house.

MEMORANDUM DECISION AND ORDER - 17

Therefore, the Court cannot find that the officers had an objectively reasonable basis for believing a victim in need of immediate help was inside the house.

One more matter needs to be discussed. Even if the officers had an objectively reasonable basis to conduct a protective sweep or an emergency aid sweep inside the house, there was no testimony provided at the hearing as to where the gun or ammunition was located. A protective sweep or emergency aid sweep is strictly for the purpose of looking for people in the house. It does not justify a comprehensive search for weapons not in plain sight. "In the context of an arrest, the Supreme Court has described a protective sweep as 'a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others,' that 'is narrowly confined to a cursory visual inspection of those places in which a person might be hiding.'" *United States v. Grey*, 959 F.3d 1166, 1182 (9th Cir. 2020) (quoting *Buie*, 494 U.S. at 327); *see also United States v. Lemus*, 582 F.3d 958, 962 (9th Cir. 2009)("[A] protective sweep is not a license to search every nook and cranny of a house, but is subject to two significant limitations: it extends only to a cursory inspection of those spaces where a person may be found and lasts no longer than it takes to complete the arrest and depart the premises." (cleaned up)). Here, there was no testimony as to where the officers found the gun and ammunition. The Court does not know if the items were in plain sight or hidden from view.

## V. CONCLUSION

In conclusion, neither the protective sweep exception nor the emergency aid exception justified the warrantless search of the Blackfoot Residence on February 14. Thus, the Court must suppress the evidence stemming from the search.

## VI. ORDER

The Court HEREBY ORDERS:

1. The Defendant's Motion to Suppress (Dkt. 20) is GRANTED.

DATED: August 29, 2022

_____
David C. Nye
Chief U.S. District Court Judge